**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL DOCKET NO.: 5:10CV95-RLV**


| | | |
|---|---|---|
| **LOUIS H.BILLIPS, JR.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Memorandum and Order** |
| | ) | |
| **BENCO STEEL, INC.,**[1] | ) | |
| **Defendant.** | ) | |
| _____ | ) | |


**THIS MATTER** is before the Court upon Defendant Benco Steel, Inc.'s ("Benco")

Motion for Summary Judgment. (Doc. 49). Also before the Court is a related Motion to Strike

filed by Plaintiff Louis H. Billips, Jr. ("Billips"). (Doc. 60).

### I.      Background

Louis H. Billips, Jr., an African American, was hired by Benco Steel, Inc., on or about

January 22, 2007. Benco is a regional steel center with operations in Hickory, North Carolina.

Benco offers metal processing and fabrication options to customers within North and South

Carolina. During his employment with Benco, Billips worked as a saw operator and later as a

steel fabricator.

In May 2008, Benco, through its Vice President of Plant Operations, Ron Borders

("Borders"), terminated Billips' employment.[2] The precipitating events occurred on May 21,

2008. It is undisputed that Billips drove a large tow motor or forklift over the edge of a steel

---

[1]  Defendant was originally named as "NC Benco Steel, Inc.," but informs the Court that the correct entity name is "Benco Steel, Inc."

[2]  Borders was also the person that hired Billips.

plate located in the driveway at the warehouse door entrance.[3]  It is also undisputed that a heated exchange between Billips and Matt Carlin ("Carlin") ensued, that both Billips and Carlin were instructed to return to their respective work stations by Dale Erickson ("Erickson"), then-acting Vice President of Plant Operations, and that there was a subsequent incident between Billips and Carlin later in the day whereby the two men "brushed shoulders" in passing.[4]  These events were eventually reported to Borders, who was not on-site that day.  Borders decided that Billips should be discharged immediately.

Consistent with Borders' instruction, Billips was first notified that he was being terminated by his immediate supervisor, Fabrication Manager Greg Bartram ("Bartram"), on Friday, May 23, 2008.  After protesting to Bartram and Executive Vice President, Jay Tate ("Tate") (Borders' manager), Tate advised Billips that an investigation would be undertaken before making a final determination.  Billips was directed to report to work the following Monday, May 26, 2008.  On May 26, 2008, Billips reported to work wearing a hidden recording device.  Billips met with Borders as well as Benco's upper-level management and continued to voice his concern that Benco uncover all of the circumstances that took place between him and Carlin on May 21, 2008.  Ultimately, Borders' decision to terminate Plaintiff was backed by Tate and Benco President Judy White.

Billips contends that during his employment at Benco, he was subject to racially discriminatory treatment, including unjustified write-ups and imposition of harsher discipline than the discipline imposed upon Causcasian co-workers, as well as racial harassment by various

---

[3]  Borders clarifies that it was not unusual for steel to be placed in one of the driving lanes of the warehouse.  Similarly, it was not unusual or forbidden to drive a tow motor or forklift in the same general areas notwithstanding steel plates.

[4]  The specifics of both encounters, including whether Billips was negligent in his operation of the tow motor (i.e., whether he was driving at full speed through the garage), and what exactly was said and done following the collision, present issues of fact.

persons in management.[5]  Plaintiff asserts that certain members of Benco's management team, including Borders, routinely made racially derogatory comments of a general nature in his presence.  Billips further alleges that his complaints to management concerning racially discriminatory comments and even co-worker threats were dismissed and never investigated.[6]  Billips argues that Benco's response to this alleged discriminatory conduct was one of indifference;  that Benco's actions were inconsistent with both federal law and with its own internal policies concerning equal employment and workplace conduct.

Plaintiff commenced litigation in this federal court on July 22, 2010.[7]  (Doc. 1).   In his Amended Complaint, Billips seeks legal, equitable, and declaratory relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.*, ("Title VII"), the Civil Rights Act of 1991; and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").   (Doc. 41 / Am. Compl.).   Billips also advances claims entitled, "Negligence / Intentional Infliction of Emotional Distress," and "Negligent Retention and Supervision," which overlap with Plaintiff's hostile work environment theory of discrimination.  (Am. Compl., at 10-11).

---

[5]  Although Billips' immediate supervisor was Greg Bartram, Borders was the decisionmaker for Benco relative to Billips.  Borders supervised Bartram, Erickson, and Material Handling Manager Kenny Kimberlin. (Borders Aff., ¶ 13). Borders also worked directly with employees, including Billips, and participated in monitoring day-to-day performance.  (Borders Aff., ¶ 13).

[6]  Neither party produces copies of any written complaints made by Billips concerning racial discrimination or harrassment. The affidavits submitted by Borders and Bartram do not address Billips' claim that he voiced many complaints of discriminatory treatment to each during his employment.

[7]  Plaintiff's cause of action is timely-filed and all administrative remedies have been exhausted for purposes of Title VII.  (Am. Compl., ¶ 62; Pl.'s Exh. 59-10).

On July 27, 2012, Defendant filed a Motion for Summary Judgment, seeking decision in its favor on all claims. Relative to Defendant's motion, Plaintiff filed a Motion to Strike one of Defendant's summary judgment exhibits based upon authentication, FED. R. CIV. P. 901.[8]

Plaintiff appears to have effectively abandoned his tort-based claims by not addressing Defendant's legal arguments as to these claims within its memorandum in opposition. *See* FED. R. CIV. P. 56(e)(2) and (3).

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2010). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).

To defeat summary judgment, the alleged factual dispute must be both "material" and "genuine." *See Pyatt v. Harvest Hope Food Bank*, 2012 WL 1098632, * 2 (D.S.C. February 1, 2012) (citing *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir.1987) (emphasis in original) (internal quotation marks & citation omitted)). A fact is "material" if

---

[8]    Plaintiff seeks to strike Benco's Exhibit 16, an Employee Conference Record ("ECR") dated May 21, 2008, because it is not signed by Billips or any Benco supervisor. Borders, who was on leave on May 21, 2008, testified that he directed another Benco manager to prepare the ECR on this date but could not recall specifically which manager he actually asked to write it up. (Borders Dep. 16). Defendant opposes the motion and contends that the exhibit was prepared by Benco, maintained by Benco as part of Billips' personnel record, and can be identified and authenticated by Borders. Accordingly, Benco asserts that Exhibit 16 is a business record as defined by FED. R. EVID. 803(6).

proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). An issue or dispute of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. at 257.

"In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor." *Pyatt*, 2012 WL 1098632, * 2 (citing *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir.2002)). "The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party." *Pyatt*, 2012 WL 1098632, *2 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms." *Id.* (citing *Reeves*, 530 U.S. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory")).

## III.    Discussion

Under Title VII, it is unlawful for an employer to discriminate against any individual on the basis of race. 42 U.S.C. § 2000e–2(a)(1) (2006). It is also unlawful for an employer to retaliate against an employee for participating in a Title VII investigation for opposing discriminatory workplace practices. *Id*. § 2000e–3(a).

The frameworks for summary judgment analysis in cases alleging race discrimination pursuant to Title VII and Section 1981 are the same.[9] *See Gariola v. Va. Dep't of Gen. Servs.*,

---

[9] Plaintiff's Section 1981 claim effectively merges with his Title VII claim.

753 F.2d 1281, 1285 (4th Cir.1985) (Section 1981 and Title VII). Accordingly, there are two avenues of proof available to Plaintiff. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir.2004) (en banc) (internal citations omitted). Billips may provide direct evidence of discrimination, such as "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir.1999) (quoting *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995)). In the absence of direct evidence, Billips may proceed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

Plaintiff relies solely on circumstantial evidence and the *McDonnell Douglas* pretext paradigm.[10] (Pl.'s Mem. In Opp'n, 11-12). Under *McDonnell Douglas,* the plaintiff must first make out a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). After the plaintiff establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the termination. *See McDonnell Douglas*, 411 U.S. at 802-03. The employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). If the employer meets this burden, "the presumption of discrimination created by the *prima facie* case disappears from the case" and the plaintiff must

---

[10] Billips does not produce any direct evidence that any disciplinary action taken against him, including his termination, was prompted by a discriminatory motive. The claim here is that Ron Borders harbored a racially discriminatory attitude toward African-Americans generally and / or permitted other managers and employees to express the same sentiment without inhibition from or pushback by Benco. However, most of the purported derogatory remarks in evidence *related to Billips specifically* are attributed to co-worker Matt Carlin, who was not a supervisor or manager. On May 21, 2008, Carlin reportedly told Billips that "Come Monday morning . . . you[Billips] will be on the unemployment line with the rest of your kind." (Billips Aff., ¶ 53).

prove that the "proffered justification is pretextual." *McDonnell Douglas*, 411 U.S. at 802-03; *see also Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 255 (1981).

No matter which method of proof is used, plaintiff maintains the burden of persuasion as to the ultimate issue – whether plaintiff can demonstrate, by a preponderance of the evidence, that plaintiff was the victim of intentional discrimination on the part of his employer. *See Diamond v. Bea Maurer, Inc.*, 128 Fed. Appx. 968, 971-72, 2005 WL 943631, * 2 (4th Cir.2005) (citing *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir.1994)); *Reeves*, 530 U.S. at 142-43 (citing *Burdine*, 450 U.S. at 453.)

## A. Second Claim For Relief – Hostile Work Environment

"Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir.2001); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir.2001) (hostile work environment elements are the same under either § 1981 or Title VII). A hostile work environment claim asserts that the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). Courts determine "whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23); S.Ct. 1508 ("[W]orkplace conduct is not measured in isolation"). "[S]imple teasing, off-hand comments, and isolated incidents (unless extremely

serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citations and internal quotation marks omitted). Rather, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the cumulative effect of individual acts"); *Spriggs*, 242 F.3d at 184.

To survive summary judgment on this issue, Billips must demonstrate that a reasonable jury could find the complained of harassment (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability. *See Spriggs*, 242 F.3d at 183-84 (internal citations and quotation marks omitted). For purposes of this motion, Benco Steel concedes the first and fourth criteria.[11] The question for the Court then is whether sufficient evidence has been presented from which a jury could reasonably find that the unwelcome conduct Billips complained of was racially motivated and whether it could be characterized as "severe and pervasive" under the applicable law.

Viewing the facts in the light most favorable to Plaintiff, there is evidence from which a jury could reasonably find that the unwelcome conduct was racially motivated. Plaintiff presents evidence of racially-charged comments allegedly made by co-workers and management alike. (*See* Pl.'s Exh. 1, Aff. ¶¶ 10, 52, 14-17; Pl.'s Exh. 3, Dep. 91-95, 139; Pl.'s Exh. 5, ¶¶ 12, 15). For instance, Billips contends that Borders often engaged in "racially offensive conversation in

---

[11] Plaintiff presents evidence of racially discriminatory statements made by Benco Managers Borders and Erickson.

the break room with Caucasian subordinates."[12]  (Pl.'s Exh. 1, Aff., ¶ 21).    In addition, Billips

claims that co-worker Matt Carlin, described by Plaintiff as "an openly offensive racist,"

engaged in racially offensive attacks on Billips.  (Pl.'s Exh. 1, Aff., ¶ 39).  According to Billips,

Carlin used the word "nigger" in conversation in the work place, and openly made comments

about other African Americans, including the President of the United States.[13]    (Pl.'s Exh. 1,

Aff., ¶¶ 41, 42, 44-45).  Billips states that his complaints to management about Carlin and others,

including those complaints made directly to Borders, were never acted upon.  (Pl.'s Exh. 1, Aff.,

¶¶ 40, 43, 46).  Thus, there is evidence that Borders, as well as the other Benco managers, were

passive in their responses to complaints of racial discrimination and similar conduct that could be

viewed by the fact-finder as contrary to Benco's EEO Policy.

There is also evidence that Billips was regularly referred to as "boy" by co-workers and

managers, including Bartram and Erickson.  In another case arising out of this district, use of the

term "boy" by an employer was specifically addressed as follows:

> If in fact such term was used in a racially derogatory context, rather than
> in reference to a young person in general, this court believes that jurors would
> equate the use of the term "boy" in such context as the use of a racial pejorative,
> which are never acceptable and which any reasonable, civil person would find
> objectionable and offensive. . . . Far more than a "mere offensive utterance," the
> word '[racial pejorative]' is pure anathema to African–Americans. Perhaps no
> single act can more quickly alter the conditions of employment and create an
> abusive working environment than the use of an unambiguously racial epithet
> such as '[racial pejorative]' by a supervisor in the presence of his subordinates.

---

[12]    The kinds of comments reported include a statement that Tiger Woods was able to swing a
golf stick so well because of slavery since "blacks had to swing [a] hoe in the fields"; and that "Blacks
can run and jump so high because of slavery because Blacks were trying to escape."  (Pl.'s Exh. 1, Aff., ¶
21).

[13]  The statement Plaintiff attributes to Carlin concerning President Obama is as follows:

"Looks like your brother Obama is ahead in the polls.  You know Obama is not going to
stay ahead boy.  If he does become President, he won't be for long; he will be
assassinated."

*Jones*, 827 F.Supp.2d at 552 (quoting *Spriggs*, 242 F.3d at 185 (citations and corresponding quotation marks omitted)). Indeed, the Fourth Circuit views an employer's use of such terms seriously. *See e.g., White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir.2004)("the word 'n[****]r' is pure anathema to African Americans [and] . . . an unambiguously racial epithet").

Viewing the facts in the light most favorable to Plaintiff, there is also evidence from which a jury could reasonably find that the unwelcome conduct was both severe and pervasive. According to Billips, the racial harrassment started his first day on the job and continued during his entire employment.[14] Billips provides evidence that the unwelcome conduct involved both racially derogatory comments and physical threats.[15] More specifically, Billips testified that he was threatened with physical harm (assaulted) on numerous occasions by co-workers. Billips reports that Carlin challenged Billips to hit him and stated that he would "whip [Plaintiff's] black ass" following the events of May 21, 2008. (Billips Aff., ¶ 52). Implying that the conduct was motivated by racially discriminatory animus, Billips claims that a Caucasian co-worker named Tony threatened him multiple times – once with a knife held to his throat, and once by driving a truck directly towards Billips and stopping within five (5) feet of hitting Billips, getting out of the truck, and then wielding a 4-foot long piece of steel and charging at Billips. (Billips Aff., ¶¶

---

[14] Billips states that Bartram stopped using the term after Plaintiff confronted Bartram and asked him to stop. Bartram denies ever calling Billips a "boy." (Bartram Aff., ¶ 18).

[15] Billips provides evidence that Benco employee, Donovan Maddox (the only other African American working Billips' shift) observed both of the May 21, 2008 encounters between Billips and Carlin and heard at least one of the alleged racially discriminatory comments made by Carlin. (Maddox Aff., ¶¶ 13-15). Maddox reported what he heard to his supervisor, Kenny Kimberlin ("Kimberlin"), since he was "very upset" with the statement he deemed to be "racially offensive." (Maddox Aff., ¶ 15). Kimberlin reportedly indicated that he was going to "stay out of it." (Maddox Aff., ¶ 18). Billips contends that Nick Valentine (a Caucasion co-worker) was present during the second May 21st run-in and can corroborate most, if not all, of Billips' version of the events leading up to his termination. (Billips Aff., ¶¶ 51, 61-64). Borders states that he determined Valentine to be unreliable. (Borders Aff., ¶ 29). Valentine reportedly disclosed to Borders that Billips asked Valentine to back Billips' story up with reference to the events of May 21, 2008. (Borders Aff., ¶ 29).

20, 29-30). Billips contends his complaints to management concerning physical threats against him at work were dismissed and characterized by Borders as "horseplay." (Billips Aff., ¶ 31). Borders allegedly told Billips that he was a big enough boy to handle himself in the event of a real threat. (Billips Aff., ¶ 31). Billips provides evidence that he was humiliated in the workplace by routinely being called "boy."[16] Benco's evidence asserts that Billips was typically the instigator in workplace altercations. Given the evidentiary record, the Court cannot determine, as a matter of law, whether a hostile work environment existed.[17] This issue will be for the jury.

Benco's motion as to Plaintiff's Second Claim for Relief is <u>denied</u>.

## B. First Claim For Relief – Racial Discrimination

Billips' First Claim for Relief alleges racial discrimination under Title VII based upon disparate treatment and retaliation. "A plaintiff is entitled to a trial on the merits of a Title VII claim if he . . . establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of discrimination or retaliation." *Jones*, 827 F.Supp.2d at 548 (quoting *Darvishian v. Geren*, 404 Fed.Appx. 822, 828 (4th Cir.2010) (citing *Burdine*, 450 U.S. at 254; *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir.1995)).

---

[16] The facts here are distinguishable from *Jones, w*here there was a single "boy" reference alleged. *See e.g., Jones*, 827 F.Supp.2d at 552-53 (even if true, single incident is not severe or pervasive).

[17] An affirmative defense is available to Benco with respect to Billips' hostile work environment claim. In order to avoid liability, Benco would have to prove the following:

> First, the employer must demonstrate that it exercised reasonable care to avoid the harassment and eliminate it when it might occur.
> Second, the employer must show that the employee failed to take advantage of the employer's safeguards and to otherwise prevent harm that could have been avoided.

*See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher*, 524 U.S. at 775, 807; *see also Spriggs*, 242 F.3d at 186 n. 9.

### 1. Discriminatory Discharge

A *prima facie* case alleging discriminatory discharge requires Billips to show: 1) that Billips is a member of a protected class; 2) that Billips had satisfactory performance; 3) that Billips was fired; and 4) that other employees who were not members of the protected class were retained under similar circumstances. *See Washington v. City of Charlotte*, 219 F.Appx. 273, 276 (4th Cir. 2007); *Muldrow v. Schmidt Baking Co., Inc.*, 2012 WL 4838500, * 7 (D.Md. October 5, 2012) (*prima facie* case not established due in part to plaintiff's inability to prove up satisfactory performance where record included at least eight poor performance evaluations and two infractions the month prior to termination).

In this case, the first and third *prima facie* criteria are not in dispute since Billips, an African-American, was ultimately fired by Benco. With respect to Plaintiff's job performance, there is contradictory record evidence. Despite the competing views advanced by the parties, the Court is required to focus on the *employer's perception* concerning Plaintiff's satisfaction of its legitimate expectations.[18]  *See Jones*, 827 F.Supp.2d at 547 (citing *Farasat v. Paulikas*, 32 F.Supp.2d 249, 255 (D.Md.1998)).   The Court is also required to evaluate the employer's legitimate expectations "at the time of the adverse employment action."[19]  *See McDonnell Douglas*, 411 U.S. at 802.

---

[18]  Because Borders both hired and fired Billips, an inference arises in favor of Benco that Borders' actual and true motivation for discharging Billips was non-discriminatory. *See Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991); *see also Jones*, 827 F.Supp.2d at 549 (court deemed span of two years between hiring and firing plaintiff "close temporal proximity.") *Jones,* 827 F.Supp.2d at 549.  In other words, this fact renders a jury verdict for Plaintiff on this issue less likely.

[19]  Accordingly, the November 2007 performance evaluation, which was signed off on by Billips, Bartram, Borders, and Tate, is less probative than the events immediately preceding Benco's termination of Plaintiff, including events that occurred May 21, 2008.  However, the weighing of the evidence is for the jury.  *See generally, Harris*, 2011 WL 1739994, * 5 (4th Cir.2011) (weighing the credibility of plaintiff's evidence is "plainly not permitted on summary judgment.") (internal citation omitted).

According to Benco, Billips' performance was substandard.  Benco contends Billips was known for his violent, unprofessional, and aggressive conduct in the workplace.  (Borders Aff., 14-17, 31 / Borders Dep. 109, 120, 124).  In responding to the EEOC Charge brought against it by Plaintiff, Benco represented that Billips "became easily agitated in the workplace and engaged in unprofessional, insubordinate, and threatening conduct on several occasions."  (Pl.'s Exh. 21 / Benco Response to EEOC Charge, at 2).

Prior to May 21, 2008, Billips had three (3) Employee Conference Records ("ECRs") in his file and he had been on probation since his last ECR in January 2008.  The first two ECRs indicated that the reason for the employee conference was "Counseling."  The August 6, 2007 ECR reads:

> "Employee showed unproffessional[sic] behavior toward another manager. (screaming)  If employee has a problem he needs to see his supervisor so he can deal with it adequately."

(Doc. 59-15, 1).  On September 7, 2007, Billips received another ECR stating:

> The employee wasn't performing upon suprvisors[sic] expectations, we had a conference and discussed the problem.

(Doc. 59-18, 1).  The January 25, 2008 ECR, both a "Counseling" and "Reprimand," reads:

> Employees[sic] behavior was very unprofessional, his[sic] is very argumentative, when confronted by supervisor about performance or duties.

> When I made the comment that he need[sic] to get the crane for another employee who just standing around "He said, you don't know what's going on ."  This behavior will not be tolerated."

(Doc. 59-16, 1).  The January 2008 ECR was represented as the "last" warning. (Id.) Billips was placed on probation for six (6) months, or through June 25, 2008.  (Id.)  According to Benco, Billips contested and refused to sign the September 2007 and January 2008 ECRs.

Plaintiff points to a November 7, 2007 performance evaluation that scores Billips as a five (5) out of six (6), with six (6) being the highest rating an employee could receive. (Pl.'s Exh. 6(d)). It is undisputed that when Bartram met with Billips to discuss his annual performance evaluation that Bartram told Billips he was "doing a great job." The evaluation speaks positively about the quality of Plaintiff's work, his work ethic or productivity, his attendance, and his ability to work with others (co-workers). Significantly, the November 2007 evaluation rates Billips as a "2" for cooperation shown in work. The additional comment reads:

> "Has a hard time cooperating at times, can show a slight resistance when asked to do something by his supervisor or others in upper management."

(Doc. 59-19, 3). Plaintiff's ability to relate appropriately to management was mentioned again in that the evaluation identifies "[a] better attitude when dealing with management" as one of two goals set for Billips. (Doc. 59-19, 4). In December 2007, shortly after his annual performance evaluation, Billips received a pay increase from Benco.

While the parties portray the events that precipitated Plaintiff's termination differently, Benco contends that Billips violated company policy in at least two (2) ways on May 21, 2008. Benco contends that Billips violated its "Use of Equipment and Company Vehicles Policy" on May 21, 2008, when Billips inadvertently drove a tow motor into the edge of a steel plate in the warehouse doorway.[20] This policy prohibits "[t]he improper, careless, negligent, destructive, or unsafe use or operation of Company equipment or vehicles" and may be grounds for termination. (Borders Aff., ¶ 10 / Pl.'s Dep. 63, Exh. 7). A copy of this policy was attached to the May 21, 2008 ECR. (Def.'s Exh. 16). Benco also contends that Billips violated its "Employee Conduct

---

[20] Benco argues that if an employee is aware of a company policy and violates the policy nonetheless, the employee is unable to satisfy this aspect of the *prima facie* case. *See e.g., Jones*, 827 F.Supp.2d at 547 (citing *Washington v. Safer Foundation*, 274 Fed.Appx. 484, 485 (7th Cir.2008)).

and Work Rules Policy"[21] as well as its "Workplace Violence Prevention Policy"[22] during his subsequent run-in with Matt Carlin later in the day.  (Borders Aff., ¶ 11 / Exh. A; Pl.'s Dep., 65 / Exh. 8).

However, the factual question concerning the level of Plaintiff's performance at work could be affected by the existence of a hostile work environment, if any.  As noted by the Supreme Court in *Faragher*, one of the considerations under a hostile work environment analysis is whether the discriminatory conduct "unreasonably interfere[ed] with an employee's work performance." *Faragher*, 524 U.S. at 787-88  (quoting *Harris*, 510 U.S. at 23).  Hence, it is understood that discriminatory conduct may interfere with an employee's work performance.[23] *See e.g., Okoli v. City Of Baltimore*, 648 F.3d 216, 222 (4th Cir.2011) (plaintiff can argue hostile work environment negatively impacted her work, while still defending her performance against defendant's attempt to show a legitimate basis for firing her); *Harris  v. Mayor and City Council of Baltimore*, 429 Fed. Appx. 195, 202, 2011 WL 1739994, * 5 (4th Cir.2011) (unpublished) (evidence demonstrated that plaintiff personally found work environment to be hostile; panel observed and made note that plaintiff's performance was affected as a result).  The question of Billips' job performance, which involves evaluating the credibility of the witnesses and weighing

---

[21]  The "Employee Conduct and Work Rules" Policy prohibits "coercing or intimidating a fellow employee, supervisor, manager, customer, or visitor" as well as "[a]busive or threatening language, fighting, interference with fellow employees, harassment of any kind, horseplay, or other types of objectionable or unsafe  conduct."

[22]  The "Workplace Violence Prevention Policy" prohibits and permits termination for "intimidation, harassment, or other threats of (or actual) violence," "fighting, 'horseplay' or other conduct that may be dangerous to themselves and others," or conduct that "threatens, intimidates, or coerces another employee . . . ."

[23]  This interplay is simply another factor in the Court's summary judgment analysis.  To be clear, the Court is not asserting that the inquiries concerning Plaintiff's performance are the same although presented in different Title VII contexts, merely that they are related.

the evidence presented, falls squarely within the province of the jury.[24]  Plaintiff's hostile work environment claim will proceed to trial.   For this reason, this Court is not inclined to decide, as a matter of law, whether Billips was  meeting Benco's legitimate expectations for purposes of Title VII.[25]  The Court further concludes that whether Billips' job performance was satisfactory at the time of his termination is also an aspect of Plaintiff's argument concerning pretext.[26]

Additionally, the Court finds that Plaintiff Billips' evidence gives rise to a genuine issue of material fact concerning the identification of other employees outside of the protected class that were retained under similar circumstances. The Fourth Circuit Court of Appeals recently explained that in order to be similarly situated in all relevant respects, employees must have "dealt with the same supervisor, [been] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke*, 387 Fed.Appx. 355, 359 (4th Cir.2010) (unpublished) (internal citations omitted); *Holtz v. Jefferson Smurfit Corp.*, 408 F.Supp.2d 193, 207 (M.D.N.C. Jan. 4, 2006) (plaintiff unable to show co-workers were similarly situated for purposes of age discrimination claim where proposed comparators did not have series of performance problems similar to plaintiff's) (citing *Rohde v. K.O. Steel Castings, Inc.*,

---

[24]  Nonetheless, the Court does not find Plaintiff's argument concerning application of *McKennon v. Nashville Banner Publ'g Co.*, persuasive.  *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995).  *McKennon* does not govern the Court's analysis concerning  this issue.

[25]  To do so, the Court would have to rely on performance evaluations as measured by some of the same individuals within Benco management that were allegedly contributing to or allowing a hostile work environment to exist.

[26]  *See e.g.*, *Muldrow v. Schmidt Baking Co., Inc.*, 2012 WL 4838500, *9 (D.Md. October 5, 2012) (noting that plaintiff's arguments about pretext overlap considerably with his argument about the legitimacy of defendant's job expectations).

649 F.2d 317, 322 (5th Cir.1981)).[27]  Matt Carlin, the only proposed comparator, had the same supervisor as Billips and was on probation as of May 21, 2008 for failing a random drug test administered by Benco.  (Borders Aff., ¶ 37).  As of May 21, 2008, Carlin had more ECRs than Billips, although it appears Benco was concerned with the quality of Carlin's work (i.e., production errors) as opposed to Carlin's lack of cooperation, non-compliance, or aggressive conduct. (Pl.'s Exhs. 15-19 / Borders Aff., ¶ 36).  Plaintiff presents evidence that Carlin was the aggressor on May 21, 2008 after the tow motor incident, that Carlin did not return to his work station as instructed by management, and that Carlin took the opportunity to sling more racially derogatory statements at Billips.

At this stage, the Court finds that Billips presents evidence from which a reasonable jury could conclude that co-worker Matt Carlin was similarly situated to Billips as of May 21, 2008, but kept his job while Billips was terminated.  (Pl.'s Mem. In Opp'n, 17-23.).

### 2.  Retaliation / Disciplinary Actions

To establish a *prima facie* case of unlawful retaliation  Billips must show: (1) that he engaged in protected activity or opposed a practice made unlawful by Title VII, (2) that the employer took adverse employment actions against him, and (3) that there was a causal connection between the protected activity and the adverse action.  *See Jones*, 827 F.Supp.2d at 554 (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir.2005)).

In addition to his discriminatory discharge theory, Plaintiff alleges that Benco's motivation for disciplinary action taken against Billips was Billips' reporting of racial harassment and discrimination he was experiencing.  In *Jordan v. Alternative Res. Corp.*, the Fourth Circuit noted that one of the "unlawful employment practices" an employee can oppose,

---

[27]  The Fifth Circuit stated in *Rohde* that in the analysis of comparable employees, "[w]hat is relevant is that two employees are involved in or accused of the *same offense* and are disciplined in *different ways.*" *Rohde*, 649 F.2d at 322.

and thereby be protected from retaliation, may include maintaining a racially hostile work environment. *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 339 (4th Cir.2006) (internal citations and quotations omitted). Thus, Plaintiff's complaints to Benco regarding a racially hostile work environment satisfy the first *prima facie* element.

In terms of the adverse employment action element, the ECRs and probationary status cannot be considered unless they "adversely affect[ed] the terms, conditions, or benefits of [P]laintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal citations omitted). "A written warning, without more, does not constitute an adverse employment action." *Jones*, 827 F.Supp.2d at 550 (citing *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651–52 (4th Cir.2002)); *Douglas v. Donovan*, 559 F.3d 549, 552-53 (D.C.Cir.2009) (the effect of a poor performance evaluation "is ordinarily too speculative to be actionable" under Title VII) (internal citations omitted). Defendant contends that the January 2008 ECR that served as the first official "Reprimand" and placed Billips on probation does not constitute an adverse employment action. *See Cornelius v. City of Columbia*, 663 F.Supp.2d 471, 476-77 (D.S.C. 2009) (plaintiff's complaints regarding an evaluation, a brief period of probation, alleged unwarranted criticism and unfavorable job assignments do not constitute "adverse employment actions"); *but see Douglas*, 559 F.3d at 553 (recognizing categories of employment actions that do not obviously result in a significant change in employment status, but nonetheless cause an objectively tangible harm); *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010) ("[W]e have previously suggested that placing an employee on probation might constitute an adverse employment action.") (internal citation omitted). Borders avers that the ECRs did not impact or change Billips' job status, compensation, or responsibilities. (Borders Aff., ¶¶ 18, 21, 24). At the same time, Borders avers that "[g]iven the

final warning and probation, Billips would be discharged if he engaged in any additional aggressive, intimidating, or violent acts or altercations in the workplace." (Borders Aff., ¶ 24). Benco does not adequately address the cumulative effect of the ECRs and the six-month probationary status. *See* e.g., *Leatherwood v. Anna's Linens Co.*, 384 Fed.Appx. 853, 858 (11th Cir.2010) (viewed cumulatively, the multiple counseling notices, negative evaluation, and 30–day probation constituted adverse employment action for purposes of Title VII retaliation) (internal citation omitted).

The third *prima facie* element requires Plaintiff to demonstrate a causal connection between the complaints Billips made to management about what he perceived to be racially discriminatory hostile work environment and disciplinary action taken. The record reveals there was discord between Billips and Benco management. Determining the underlying cause for this discord, and any effect it may have had on the claims alleged by Plaintiff, are better suited for the jury.

In conclusion, recognizing the interplay between Billips' hostile work environment claim and his remaining claims, the Court will <u>deny</u> summary judgment on the other claims brought under Title VII, including Plaintiff's retaliatory discharge claim. Benco's motion as to Plaintiff's First and Third Claims for Relief will be <u>denied</u>. The Court will likely revisit certain of these issues in entertaining Defendant's Rule 59 Motion for Judgment as a Matter of Law at the close of Plaintiff's evidence.

### C. Damages

Plaintiff's final cause of action purports to be an action for "damages" and includes a specific request for punitive damages. (Doc. 41 / ¶¶ 58-61). Under North Carolina law, punitive damages may be awarded "only if the claimant proves that the defendant is liable for

compensatory damages." N.C.Gen.Stat. § 1D-15(a). However, there is no independent cause of action for litigants seeking to recover punitive damages. *See Collier v. Bryant*, 719 S.E.2d 70, 82 (N.C.App.2011); *see also Walker v. White*, 2010 WL 883662, * 8 n. 3 (citing *Hawkins v. Hawkins*, 400 S.E.2d 472, 474 (N.C.App. 1991) and *Combs & Assocs., Inc. v. Kennedy*, 555 S.E.2d 634, 642-43 (N.C.App. 2001)). Plaintiff recognizes as much in his opposition brief and clarifies that his "damages" claim is attendant to the substantive causes of action. *See e.g., Iadanza v. Harper*, 611 S.E.2d 217, 223 (N.C.App. 2005) (punitive damages are "mere incidents of the cause of action"). Therefore, Defendant's motion seeking summary judgment in this regard is <u>denied as moot</u>.

## IV.    Order

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part.** Defendant's motion is **GRANTED** with respect to Plaintiff's claims alleging Negligence / Intentional Infliction of Emotional Distress (Fourth Claim for Relief), and Negligent Retention and Supervision (Fifth Claim for Relief). Defendant's motion is **DENIED** with respect to Plaintiff's claims alleging racial discrimination based upon disparate treatment (First Claim for Relief), racial harrassment / hostile work environment (Second Claim for Relief), and retaliatory discharge (Third Claim for Relief) under Title VII and Section 1981. Plaintiff's claim alleging damages (Sixth Claim for Relief) is not an independent cause of action and this aspect of Defendant's motion is **DENIED as moot**.

This matter will proceed to jury trial during the May 2013 Statesville Division Term, and is designated as the FIRST TRIAL to be heard. Calendar Call will be held on Monday, May 6, 2013 at 10:00 a.m. Jury Selection will occur on **Tuesday, May 7, 2013, beginning at 9:30 a.m.**

Immediately following Jury Selection, the parties should be prepared with opening statements and the presentation of evidence.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike is hereby **DENIED**.

Signed: April 30, 2013

Richard L. Voorhees
United States District Judge